**QUALCOMM INCORPORATED,**
Petitioner,

v.

**FEDERAL COMMUNICATIONS COMMISSION and United States of America, Respondents.**

**PrimeCo Personal Communications, L.P., and Sprint Spectrum L.P., Intervenors.**

No. 98–1246.

United States Court of Appeals, District of Columbia Circuit.

Argued April 22, 1999.

Decided July 23, 1999.

Veronica M. Ahern argued the cause and filed the briefs for petitioner.

James M. Carr, Counsel, Federal Communications Commission, argued the cause for respondents. With him on the brief were Joel I. Klein, Assistant Attorney General, U.S. Department of Justice, Robert B. Nicholson and Robert J. Wiggers, Attorneys, Christopher J. Wright, General Counsel, Federal Communications Commission, Daniel M. Armstrong, Associate General Counsel, and John E. Ingle, Deputy Associate General Counsel.

Robert A. Long, Jr. argued the cause for intervenors. On the brief was Luisa L. Lancetti. Andrew J. Heimert entered an appearance.

Before: EDWARDS, Chief Judge, WALD and ROGERS, Circuit Judges.

Opinion for the Court filed by *Circuit Judge* ROGERS.

ROGERS, Circuit Judge:

In *Freeman Engineering Associates v. FCC*, 103 F.3d 169 (D.C.Cir.1997), the court held that although the Federal Communications Commission ("FCC") could reasonably interpret its rules for awarding pioneer's preferences to mean that adaptations of technology are not innovative, it had not applied the interpretation equally among all preference applicants to QUALCOMM's detriment. *See id.* at 180. The court granted QUALCOMM's petition for review, vacated that part of the FCC's decision denying QUALCOMM's preference request, and remanded "for further proceedings to remedy this inconsistency." *Id.* Before the FCC granted such a remedy, but after the court's mandate issued in *Freeman Engineering,* Congress advanced the sunset date for the FCC's authority to award pioneer's preferences and the FCC dismissed all pending preference applications, including QUALCOMM's. We grant QUALCOMM's petition for review of this dismissal because the FCC misinterpreted

*Freeman Engineering* as ordering no more than a general remand for further proceedings, and thereby misapplied the sunset provision withdrawing its authority to award new pioneer's preferences to a final judgment that entitled QUALCOMM to a pioneer's preference under the rules then in effect.

## I.

The background for this appeal is set forth in *Freeman Engineering*, and therefore we summarize only four relevant areas. First, the FCC promulgated the pioneer's preference rules in 1991 in an effort "to reduce the risk and uncertainty innovating parties face in our existing rulemaking and licensing procedures, and therefore to encourage the development of new services and new technologies." *Establishment of Procedures to Provide a Preference to Applicants Proposing an Allocation for New Services,* 6 F.C.C.R. 3488, 3492 (1991) (*"Pioneer's Preference Order"*). Thus, an applicant demonstrating "that it (or its predecessor-in-interest) has developed an innovative proposal that leads to the establishment of a service not currently provided or a substantial enhancement of an existing service," *id.* at 3494, would "effectively ... [be] guarantee[d] ... a license in the new service (assuming it is otherwise qualified) by permitting the recipient of a pioneer's preference to file a license application without being subject to competing applications." *Id.* at 3492; *see also* 47 C.F.R. § 1.402(a) (1995); *Adams Telcom, Inc. v. FCC,* 38 F.3d 576, 578 (D.C.Cir.1994).

Second, QUALCOMM applied for a pioneer's preference, the FCC denied it, and on appeal QUALCOMM prevailed. QUALCOMM requested a pioneer's preference for a license in the Southern Florida Major Trading Area ("MTA") based on technology developed for use in broadband (2 GHz) personal communications services ("PCS"). *See Request for a Pioneer's Preference for a Personal Communications Services System,* Gen. Docket 90–314 (May 4, 1992). In 1992, the FCC tentatively granted three pioneer's preferences—to American Personal Communications ("APC"), Cox Enterprises, Inc. ("Cox"), and Omnipoint Communications, Inc. ("Omnipoint")—and dismissed the remaining applications. *See Amendment of the Commission's Rules to Establish New Personal Communications Services: Tentative Decision and Memorandum Opinion and Order,* 7 F.C.C.R. 7794, 7797–7809 (1992) (*"Tentative Decision"*). The FCC explained in rejecting QUALCOMM's application that its proposed technology was "essentially ... identical to that which it already ... developed for use in the 800 MHz cellular bands." *Id.* at 7807. In 1994, the FCC affirmed its decision granting preferences to APC, Cox, and Omnipoint, and denying QUALCOMM a preference because its work was merely an adaptation of previously developed technology. *See Amendment of the Commission's Rules to Establish New Personal Communications Services: Third Report and Order,* 9 F.C.C.R. 1337, 1339–48, 1368–70 (1994) (*"Third Report and Order"*). After the FCC denied its petition for reconsideration, *see Amendment of the Commission's Rules to Establish New Personal Communications Services: Memorandum Opinion and Order,* 9 F.C.C.R. 7805, 7810–11 (1994) (*"Reconsideration Order"*), QUALCOMM petitioned for review by this court.

On appeal, the court vacated that part of the FCC's decision denying QUALCOMM's preference application, concluding that although the FCC could reasonably interpret its pioneer's preference rules to mean that adaptation of technology was not innovative, it could not discriminate among preference applicants in applying its rules. *See Freeman Eng'g,* 103 F.3d at 178–80. Because Omnipoint had also based its 2 GHz application on technology adapted from work it had done on 900 MHz cellular bands tested at 900 MHz, in part prior to the promulgation of the pioneer's preference rules, the court

concluded that the FCC had acted arbitrarily and capriciously in denying QUALCOMM's application on the ground that its "proposed technology was a non-innovative adaptation" because it " 'ha[d] been developing its ... technology since 1985' and had 'validated [it] for 800 MHz.'" *Id.* at 180 (quoting *Reconsideration Order*, 9 F.C.C.R. at 7811). The court noted that although "[n]umerous parties to the FCC proceedings pointed out this disparate treatment to the Commission," the FCC had responded not by applying the "developed specifically for a particular service" test applied to QUALCOMM, but by reverting to the "associated with" test, noting that " 'Omnipoint has demonstrated that it performed significant new work related to 2 GHz PCS after adoption of the pioneer's preference rules.'" *Id.* (quoting *Third Report and Order*, 9 F.C.C.R. at 1346). Yet, the court noted, the same could be said of QUALCOMM: its "adaptation was also 'significant new work related to 2 GHz PCS.'" *Id.* Concluding that the FCC "applied a newly developed (and questionable) interpretation of its pioneer's preference rules" only to QUALCOMM, the court observed that "[w]ere this case remanded, it is not at all clear whether the Commission would continue to adhere to this interpretation of the pioneer's preference rules." *Id.* The court's disposition in granting QUALCOMM's petition read:

> [W]e find reasonable the Commission's interpretation of the pioneer's preference rules such that adaptations of technology are not innovative and thus not deserving of a preference. However, we conclude that the Commission failed to apply this interpretation consistently to the detriment of QUALCOMM's application for a preference. We therefore vacate that portion of the Commission's decision denying QUALCOMM's preference request. We remand for further proceedings to remedy this inconsistency.

*Id.* The court's mandate issued April 18, 1997.

Third, Congress changed the landscape of the pioneer's preference program in two ways relevant here, the first occurring before the court issued its mandate, and the second occurring after. As to auctions, before the court's mandate, Congress authorized the FCC in 1993 to auction licenses for radio spectrum. *See* Omnibus Budget Reconciliation Act of 1993, Pub.L. No. 103–66, § 6002, 107 Stat. 312, 387–392 (codified at 47 U.S.C. § 309(j)(1)-(12) (1994)); *see also Amendment of the Commission's Rules to Establish New Personal Communications Services: Second Report & Order*, 8 F.C.C.R. 7700, 7707–09 (1993). One of the auctions resulted in the issuance of a license for the area sought by QUALCOMM, the Miami–Fort Lauderdale MTA, to PrimeCo Personal Communications and Sprint Spectrum, intervenors in this appeal.

In addition, Congress precluded review of granted preferences and established a sunset date for the FCC's authority to grant preferences. After the first auction for narrowband PCS generated over $650 million,[1] *see FCC Report to Congress on Spectrum Auctions,* FCC 97–353 at 10 (Sept. 30, 1997), and in view of the fact that "pioneers" received the license of their choice without payment, Congress amended the Communications Act in 1994 to require the FCC to "recover for the public a portion of the value of the public spectrum resource" from pioneers, with provisions for installment payments over a five year period. Uruguay Round Agreements Act, Pub.L. No. 103–465, § 801, 108 Stat. 4809, 5050–51 ("GATT") (codified at 47 U.S.C. § 309(j)(13) (B) & (C) (1994)); *see also* H.R.Rep. No. 103–826, pt. 2, at 26 (1994), U.S. Code Cong. & Admin. News at 3773, 3798. Congress also directed the FCC to award licenses within fifteen days

---

1. As of September 30, 1997, winning net bids in FCC spectrum auctions totaled almost $23 billion. *See FCC Report to Congress on Spectrum Auctions,* FCC 97–353 at 10–11 (Sept. 30, 1997).

to those granted preferences in the *Third Report and Order* (namely, APC, Cox, and Omnipoint) and prohibited further agency or judicial review of those preferences and licenses. *See* GATT, 108 Stat. at 5051 (codified at 47 U.S.C. § 309(j)(13)(E)(i)). Further, Congress added a sunset provision, terminating the FCC's authority to grant pioneer's preferences after September 30, 1998. *See id.* at 5052 (codified at 47 U.S.C. § 309(j)(13)(F)). After the court issued its mandate, Congress advanced the sunset date from September 1998 to August 5, 1997. *See* Balanced Budget Act of 1997, Pub.L. No. 105–33, § 3002(a)(1)(F), 111 Stat. 251, 259 (1997) (amending 47 U.S.C. § 309(j)(13)(F)).

Fourth, on remand, despite QUAL-COMM's urging of the FCC to comply with 47 U.S.C. § 402(h),[2] by "forthwith" granting it a pioneer's preference, the FCC reopened the proceedings for comment on QUALCOMM's application and ultimately dismissed QUALCOMM's application for lack of power to act. From the start of the remand proceedings, QUAL-COMM sought prompt agency action to implement *Freeman Engineering*. In responding to a February 25, 1997, request of the General Counsel and the Office of Engineering and Technology ("OET"), QUALCOMM summarized their meeting on January 31, 1997, (24 days after the court issued its decision in *Freeman Engineering* and almost three months before

the mandate issued on April 18, 1997), when QUALCOMM advised that it sought a preference for its pioneering work and emphasized the need for a quick award to minimize prejudice to QUALCOMM in the marketplace. At that meeting QUAL-COMM also advised that it was willing to work with the FCC on alternative remedies that did not require rescission of Sprint's Miami license, referring specifically to available C Block Basic Trading Area ("BTA") licenses and the Phoenix BTA. In response to OET's February 18, 1997, notice announcing a filing period for comments on QUALCOMM's preference application, *see* Public Notice DA 97–351, 12 F.C.C.R. 2364 (1997), PrimeCo and Sprint submitted comments on March 20, 1997, recommending that, assuming the FCC found that QUALCOMM was entitled to a preference, it award QUALCOMM a license for alternative spectrum.[3] QUAL-COMM in its comments stated that under *Freeman Engineering*, it was entitled to be treated in the same manner as Omnipoint and, thus, to have its preference granted.

On April 15, 1997, OET advised QUAL-COMM that it was "actively working" on the remand and that FCC "action c[ould] be anticipated 'by summer.'"[4] On May 27, 1998, QUALCOMM wrote directly to the Chairman of the FCC that it "should grant QUALCOMM's preference application promptly, with the understanding that"

---

2. Section 402(h) provides:

In the event that the court shall render a decision and enter an order reversing the order of the Commission, it shall remand the case to the Commission to carry out the judgment of the court and it shall be the duty of the Commission, in the absence of the proceedings to review such judgment, to forthwith give effect thereto, and unless otherwise ordered by the court, to do so upon the basis of the proceedings already had and the record upon which said appeal was heard and determined.

47 U.S.C. § 402(h).

3. QUALCOMM objected to reopening the proceeding on the grounds that (1) three years had passed since the FCC denied QUAL-

COMM's preference, (2) the court's vacation and remand were narrow, requiring no further factual development, and (3) the FCC's obligation under § 402(h) did not contemplate reopening the proceeding. The FCC nonetheless reopened the proceeding and made Sprint and PrimeCo parties. *See QUALCOMM Inc., Request for Pioneer's Preference,* Public Notice DA 97–423, 12 F.C.C.R. 2417 (1997).

4. QUALCOMM had requested a meeting with OET after reading a quote in the April 7 issue of *Wireless World* from an FCC staff member that resolution of the matter could take "a year or two." *See* Letter from Richard M. Smith, Chief of OET, to Veronica M. Ahern, Counsel for QUALCOMM (Apr. 15, 1997).

while "the substantive decision is foreordained by the record, ... we recognize that implementation of the decision has certain practical ramifications," and that "QUALCOMM is willing to discuss substitution of presently unlicensed service areas of comparable significance [to the MTA in South Florida]."

On September 11, 1997, the FCC dismissed all pending pioneer's preference applications, including QUALCOMM's, on the ground that the Balanced Budget Act of 1997 withdrew the FCC's authority to grant any preferences. *See Dismissal of All Pending Pioneer's Preference Requests,* 12 F.C.C.R. 14006, 14007 (1997) (*"Dismissal Order"*). As to QUALCOMM, the FCC noted that although the court had vacated the denial of QUALCOMM's preference request and "remanded to the Commission for further consideration ... [it] no longer ha[d] authority to act on it." *Id.* at 14008 n. 10.

The court denied QUALCOMM's motion to enforce the mandate in *Freeman Engineering* for lack of exhaustion because its petition for reconsideration was pending before the FCC. *See Freeman Eng'g Assocs. v. FCC,* No. 94–1779 (D.C.Cir. Nov.5, 1997). Having been denied reconsideration, *see Dismissal of All Pending Pioneer's Preference Requests,* 13 F.C.C.R. 11485 (1998) (*"Reconsideration Order"*), QUALCOMM now appeals the FCC's *Dismissal* and *Reconsideration Orders* of September 11, 1997, and April 23, 1998, respectively.

## II.

■■■ Under *Chevron,* the court must first determine "whether Congress has directly spoken to the precise question at issue." *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* at 842–43, 104 S.Ct.

2778. There is no dispute here that the Budget Act of 1997 terminated the FCC's authority, effective August 5, 1997, to grant pioneer's preferences. Because the statute is silent, however, with respect to QUALCOMM's situation, the question is whether the FCC properly interpreted the sunset provision to apply to QUALCOMM's application; in other words, the question is whether Congress intended its withdrawal of the FCC's authority to grant pioneer's preferences to foreclose the FCC from carrying out the mandate of a final judicial decision. *See id.* at 843, 104 S.Ct. 2778.

Rejecting QUALCOMM's contentions of entitlement arising from the court's mandate, the FCC maintains that its interpretation of the sunset provision is entitled to deference under *Chevron, id.* at 842–45, 104 S.Ct. 2778 (1984), because Congress unambiguously intended to extinguish the FCC's authority to grant pioneer's preferences after August 5, 1997. In the FCC's view, QUALCOMM's application was no different from the other pending applications inasmuch as the court in *Freeman Engineering* had "simply directed the FCC to reconsider whether QUALCOMM was entitled to the same sort of pioneer's preference that Omnipoint received—an opportunity to obtain a broadband PCS license without having to face competing applications" and it was "required ... only to consider whether QUALCOMM was entitled to the pioneer's preference for which it applied." Respondents' Brief at 24, 26.

Although a court will generally defer to an agency's reasonable interpretation of a statute, the effect of such deference here would be to make retroactive a statute that does not expressly call for it, *see Landgraf v. USI Film Prods.,* 511 U.S. 244, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994), and to pose a constitutional question of whether Congress could change the result of a final judicial decision, *see Plaut v. Spendthrift Farm, Inc.,* 514 U.S. 211, 240, 115 S.Ct. 1447, 131 L.Ed.2d 328 (1995). While we agree with the FCC that the sunset provi-

sion extinguished its authority to grant preferences, we disagree that it applied to QUALCOMM's application. The mandate in *Freeman Engineering* provided the FCC with the authority it required to carry out the court's instruction to "remedy this inconsistency" by granting QUALCOMM a pioneer's preference and awarding a license for a suitable spectrum. The court had subject matter jurisdiction and ordered a remedy that was within its discretion. We hold, therefore, that the sunset provision did not extinguish QUALCOMM's entitlement to a preference, much less the FCC's authority and duty to provide a remedy for QUALCOMM under the mandate in *Freeman Engineering*. Accordingly, we grant QUALCOMM's petition and remand for the FCC "forthwith" to grant QUALCOMM a pioneer's preference and to identify and award an appropriate license to it, commensurate with the spectrum it had requested in its application.

### A.

The only plausible reading of *Freeman Engineering* required the FCC to grant QUALCOMM a pioneer's preference under either of two theories. First, the FCC could abandon the "newly developed" and "questionable" interpretation of its pioneer's preference rules that it had applied to QUALCOMM and award QUALCOMM a preference under the same interpretation of the rules that permitted the award of a preference to Omnipoint. *Freeman Eng'g*, 103 F.3d at 180. Second, the FCC could adhere to its newly developed interpretation, but it still had to award QUALCOMM a preference "to remedy th[e] inconsistency" in its treatment of two similarly situated applicants, QUALCOMM and Omnipoint. *Id.* As the FCC made clear in its brief in *Freeman Engineering*, Congress had precluded reconsideration of the awards to the three original preference recipients, including Omnipoint. *See* 47 U.S.C.

§ 309(j)(13)(E)(i); Respondents' Brief in *Freeman Engineering* at 18, 54 n. 59.

Contrary to its apparent assumption, the FCC had no discretion on remand to re-evaluate QUALCOMM's application; it had previously ruled, explaining its reasons for denying QUALCOMM a pioneer's preference, and it had reaffirmed its ruling and reasoning on reconsideration. The court nonetheless agreed with QUALCOMM's claim of discriminatory treatment and on remand did not accord to the FCC another bite at the explanation apple. In *Freeman Engineering*, the FCC did not raise the possibility of further evaluation on remand in its brief on appeal. Nor did the FCC have discretion on remand to show that there was no inconsistency because Omnipoint satisfied the pioneer's preference rules as newly interpreted and applied to QUALCOMM; this argument was raised and rejected in *Freeman Engineering*, 103 F.3d at 180. Although the FCC did maintain that if QUALCOMM and Omnipoint were similarly situated, then the FCC would have been required to deny both applications, *see* Respondents' Brief in *Freeman Engineering* at 54, neither the FCC nor QUALCOMM claimed that Omnipoint was not entitled to a pioneer's preference under the FCC's rules. *See id.*; Petitioners' Reply Brief at 23.

The FCC's sole discretion on remand, therefore, was to fashion an appropriate remedy for QUALCOMM in view of the fact that the Miami–Fort Lauderdale MTA sought by QUALCOMM had been awarded as a result of an auction to Sprint. QUALCOMM and the intervenors argued on remand, and the FCC did not claim to the contrary, that the FCC had authority to grant QUALCOMM alternative relief. QUALCOMM repeatedly indicated its willingness to accept relief comparable to the original license sought in its preference application, suggesting several specific alternatives. According to the FCC at oral argument, this could have been technically achieved by allowing QUALCOMM to amend its application, and at that point,

the FCC could have awarded the pioneer's preference. Even if the identification of an appropriate alternative spectrum could not be accomplished "forthwith"—a claim the FCC does not make—QUALCOMM's May 1997 letter to the FCC chairman made clear that the grant of a pioneer's preference and the grant of a license were not inseparable: the FCC could formally grant QUALCOMM a pioneer's preference based on the work identified in its preference application and award a license for a specific spectrum at a later time. Indeed, to the extent that the FCC did not dispute QUALCOMM's recitation of its January 31, 1997 meeting, the FCC initially appeared to be proceeding on remand to craft a remedy, but somehow became diverted when, contrary to § 402(h), it reopened the proceedings, over QUALCOMM's objection, issuing a public notice for comment and joining the intervenors as parties.

The FCC's contention that the mandate in *Freeman Engineering* was not to grant QUALCOMM a pioneer's preference *per se* because the language of the court's opinion was rather vague, remanding for "further proceedings," which the FCC has now interpreted to give it greater remedial discretion, reveals its misunderstanding of the mandate. The FCC chooses to focus on only the first part of the court's express and pointed instruction to the FCC in *Freeman Engineering*. The court did not remand generally for "further proceedings," but rather for "further proceedings to remedy this inconsistency." *Freeman Eng'g*, 103 F.3d at 180. By noting the similarities between QUALCOMM's and Omnipoint's applications, and the FCC's unpersuasive attempts to distinguish them during administrative proceedings and on appeal, the court made clear that it was not remanding for a better explanation from the FCC of its denial of QUALCOMM's application, but rather had rejected the FCC's explanations and instead ordered concrete relief for QUALCOMM. In addition, the FCC chooses to ignore the effect of its own brief in *Freeman Engineering*, which had pointed out that QUALCOMM's application could not be granted for the original license that it sought because that license had been awarded in auction. *See* Respondents' Brief in *Freeman Engineering* at 20. Hence, the court recognized that alternative relief remained to be identified and that a remand for "further proceedings" for that purpose was required. While all of this appears rather clear from the court's opinion, the FCC has chosen to ignore both the instructions of the court and the requirements of § 402(h).

In short, the FCC misinterpreted the mandate in *Freeman Engineering* to assign it more than a ministerial role with regard to the grant of a pioneer's preference to QUALCOMM. The remand in *Freeman Engineering* was not simply "for further proceedings," but to afford QUALCOMM a remedy in view of the FCC's inconsistent treatment of it, and that remedy—given the statutory context—meant that QUALCOMM was entitled to a pioneer's preference. Although the court might have been more explicit, its instruction to the FCC to "remedy this inconsistency" was unusual language and clear in the context of a complex administrative appeal in which QUALCOMM alone, out of many petitioners, prevailed and where Congress had barred the FCC from rescinding Omnipoint's preference.

### B.

Had the FCC acted "forthwith" in accordance with the *Freeman Engineering* mandate, QUALCOMM would have been granted its pioneer's preference before Congress advanced the sunset date in the 1997 Budget Act. By extending the remand proceeding, however, the FCC created a need to interpret the new sunset provision, which it read to relieve itself of the duty to carry out the mandate issued more than four months previously. This interpretation of Congress' withdrawal of the FCC's authority to award new pio-

neer's preferences is flawed for several reasons.

First, the statute is silent on whether it applies retroactively to divest QUALCOMM of the fruits of its victory in court. QUALCOMM's application was different than other pending applications before the FCC. For the other numerous pending applications, of course, the mere filing of a license application did not give the applicant a vested right to consideration under then-prevailing standards, *see Hispanic Info. & Telecomm. Network v. FCC,* 865 F.2d 1289, 1294–95 (D.C.Cir. 1989), and the FCC retained discretion to change the standards during the course of proceedings. *See Melcher v. FCC,* 134 F.3d 1143, 1164 (D.C.Cir.1998); *Chadmoore Communications, Inc. v. FCC,* 113 F.3d 235, 241 (D.C.Cir.1997). QUALCOMM, however, had prevailed on appeal and obtained an express judicial instruction to the FCC that was more than a mere opportunity for the FCC to reevaluate its application. To view the relief that QUALCOMM had obtained in *Freeman Engineering* as extinguished by a later-enacted sunset provision would contravene Supreme Court doctrine governing interpretation of potentially retroactive statutes. As *Landgraf* and similar authority make clear, absent an express statement that a statute will apply to events preceding its enactment, it may not be interpreted to impair rights a party possessed when Congress acted. *See Landgraf,* 511 U.S. at 280, 114 S.Ct. 1483; *see also Martin v. Hadix,* —— U.S. ——, 119 S.Ct. 1998, —— L.Ed.2d —— (1999); *Lindh v. Murphy,* 521 U.S. 320, 324–26, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997). Congress gave no such express command in either the 1994 or 1997 sunset provisions. Consequently, because QUALCOMM's preference application was not simply a pending application as to which no vested entitlement had attached, the FCC could not properly interpret the sunset provision to extinguish QUALCOMM's entitlement to a preference under *Freeman Engineering.*

Second, the FCC mistakenly conflated the sunset of its authority to issue new pioneer's preferences and its continuing obligation under the mandate in *Freeman Engineering* to "remedy this inconsistency." In the FCC's view, until it acted to grant QUALCOMM a pioneer's preference on remand, QUALCOMM had no right to one, and once Congress eliminated the FCC's authority to grant such preferences, the FCC was without authority to act in accordance with the mandate of this court. This position overlooks the fact that Congress amended the Communications Act to add subsection (h) to § 402 so that the court would remain in control of the remand and the FCC could not deprive a victor in the courts of the spoils of its victory. *See* S.Rep. No. 82–44, at 12 (1951); *Greater Boston Television Corp. v. FCC,* 463 F.2d 268, 281–82 (D.C.Cir.1971). As explained in the Senate Report, subsection (h) was "intended to confer upon the appellate court a measure of control commensurate with the dignity and responsibility of that tribunal." S.Rep. No.82–44, at 12 (1951). In *Greater Boston Television Corporation,* the court viewed subsection (h) as designed to "ensure deference to the court's intention in its disposition...." 463 F.2d at 281–82. Accordingly, on remand, the FCC had "the duty" to give immediate and effective relief to QUALCOMM consistent with *Freeman Engineering. Id.* at 282.

The FCC's contrary interpretation ignores settled law that the mandate of a court issuing a final judgment carries force beyond a victory in that immediate court. The "action[s] of a court in setting aside the order of the Commission [are not] an empty gesture," but rather a judgment that is the "final and indisputable basis of action as between the Commission and the defendant." *FPC v. Pacific Power & Light Co.,* 307 U.S. 156, 160, 59 S.Ct. 766, 83 L.Ed. 1180 (1939) (internal quotation omitted); *see also International Union of Mine, Mill & Smelter Workers v. Eagle–Picher Mining & Smelting Co.,* 325 U.S.

335, 340–41, 65 S.Ct. 1166, 89 L.Ed. 1649 (1945). Thus, the court's mandate obliged the FCC to award QUALCOMM a pioneer's preference with such spectrum adjustment as was necessitated by the GATT provision barring the reconsideration or withdrawal of granted preferences, *see* 47 U.S.C. § 309(j)(13)(E)(i), and the award of the original spectrum sought by QUAL-COMM to another entity. *Cf. Mefford v. Gardner*, 383 F.2d 748, 758 (6th Cir.1967). The fact that Congress in the interim extinguished the FCC's authority to award pioneer's preferences is of no consequence because § 402(h) provided the FCC with an independent source of authority to implement the mandate of a court acting within its jurisdiction and ordering a remedy within its discretion.

Third, the FCC's interpretation of the sunset provision raises constitutional concerns under *Plaut v. Spendthrift Farm*, warranting application of the canon of constitutional doubt, which states that ambiguous statutes should not be read to raise a serious constitutional question when a reasonable and clearly constitutional alternative is available. *See, e.g., Jones v. United States*, —— U.S. ——, 119 S.Ct. 1215, 1222, 143 L.Ed.2d 311 (1999). In *Plaut*, the Supreme Court surveyed the legal history underlying the now settled proposition that a final judgment of a court cannot be undone by congressional legislation as to the parties before the court. 514 U.S. at 219–225, 115 S.Ct. 1447.[5] Distinguishing the rule that changes in statutory law occurring during the pendency of litigation generally must be applied to that litigation, *see United States v. Schooner Peggy*, 5 U.S. (1 Cranch) 103, 110, 2 L.Ed. 49 (1801), the Supreme Court instructed in *Plaut* that the separation of powers doctrine embedded in the Constitution protects the final judgment of Article III courts from legislative interference.[6] *Plaut*, 514 U.S. at 226, 115 S.Ct. 1447. Starting from the premise that Article III establishes a "judicial department" with the "province and duty . . . to say what the law is," *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177, 2 L.Ed. 60 (1803), the Court concluded that the historical record "shows that the Framers crafted this charter of the judicial department with an expressed understanding that it gives the Federal Judiciary the power, not merely to rule on cases, but to decide them, subject to review only by" superior Article III courts. *Plaut*, 514 U.S. at 218–19, 115 S.Ct. 1447; *see* THE FEDERALIST No. 81, at 545 (Alexander Hamilton) (J. Cooke ed.1961). By passing retroactive legislation affecting a case already finally adjudicated, Congress had circumvented the fundamental principle that the judicial power includes the authority to render dispositive judgments, and had thus violated the principle of separation of powers. *See Plaut*, 514 U.S. at 219,

**5.** *Plaut* concerned Congress' extension of the statute of limitations in civil actions to enforce the federal securities laws. In 1987, Plaut filed a securities fraud action seeking damages for alleged violations in 1983 and 1984. *See Plaut*, 514 U.S. at 213, 115 S.Ct. 1447. While the lawsuit was pending, however, the Supreme Court held in *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*, 501 U.S. 350, 111 S.Ct. 2773, 115 L.Ed.2d 321 (1991), that such actions had to be commenced within one year after the discovery of the facts constituting the violation and within three years after the violation. *See id.* at 364, 111 S.Ct. 2773. Applying *Lampf*, the district court in 1991 dismissed Plaut's complaint with prejudice as untimely filed; the judgment became final 30 days later. Responding to *Lampf*, and after the dismissal order in

*Plaut* become final, Congress enacted a statute purporting to reinstate the lawsuits dismissed by reason of *Lampf* that would have been timely under the prior limitations period. *See Plaut*, 514 U.S. at 214, 115 S.Ct. 1447. Because the dismissal of Plaut's complaint had become final before a new statute that would have precluded dismissal went into effect, the Court held that Congress had exceeded its authority. *See id.* at 217–18, 115 S.Ct. 1447.

**6.** *Thomas v. Network Solutions*, 176 F.3d 500, 506 n. 9 (D.C.Cir.1999), does not suggest anything to the contrary. The judgment of the district court in that case was pending on appeal and therefore not final when Congress enacted the statute at issue.

115 S.Ct. 1447.[7]

■ The fact that the sunset provision, unlike the statute invalidated in *Plaut*, was not by its terms directed specifically at a particular disfavored judicial decision is irrelevant; the Supreme Court explained in *Plaut* that Congress' use of more generally applicable terms does not alter the separation of powers analysis. *See* 514 U.S. at 228, 115 S.Ct. 1447. The sunset of the FCC's preference authority did nothing to deprive the FCC of the intellectual, staffing, or resource capability to take appropriate action in QUALCOMM's favor. Nor does the FCC suggest a lack of capability. Pursuant to the remand in *Freeman Engineering*, then, despite intervening congressional action taking away its own authority, the FCC was obligated to act pursuant to the authority of the court.

Had Congress expressly commanded what the FCC contends it meant by its silence, the court would be forced to decide whether Congress acted constitutionally in light of *Plaut*. However, the sunset provision can reasonably be read not to bar relief for QUALCOMM, and it should be so read to avoid imputing to Congress the rare[8] intent to undo a final judicial mandate and the constitutional questions that such an intent would raise.[9]

Fourth, the legislative history is consistent with our interpretation of the sunset provision inasmuch as Congress sought to protect settled expectations. When Congress in 1994 set the date for withdrawal of the FCC's authority to grant new pioneer's preferences, its focus was on increasing federal revenues and not upset-

7. A final judgment for purposes of separation of powers does not include all forms of judgment by the courts. As stated in *Plaut*, a judgment at law is generally immune to subsequent legislative changes, and an attempt by Congress to alter the legal judgment of a court implicates separation of powers principles. A judgment providing prospective equitable relief, however, remains vulnerable to subsequent legislative action that accordingly would not raise the same separation of powers concerns. *See Plaut*, 514 U.S. at 232, 115 S.Ct. 1447; *Pennsylvania v. Wheeling & Belmont Bridge Co.*, 59 U.S. (18 How.) 421, 431, 15 L.Ed. 435 (1855); *see also System Fed'n No. 91 v. Wright,* 364 U.S. 642, 649–52, 81 S.Ct. 368, 5 L.Ed.2d 349 (1961); *BellSouth Corp. v. FCC*, 162 F.3d 678, 692–93 (D.C.Cir. 1998). The mandate in *Freeman Engineering* to remedy the FCC's prior inconsistent treatment of QUALCOMM and Omnipoint, and thereby grant QUALCOMM a pioneer's preference, was a final judgment entitling QUALCOMM to a preference, not a judgment with prospective effects subject to evolving conduct or conditions.

8. Until *Plaut*, the Supreme Court was unaware of any "instance in which Congress has attempted to set aside the final judgment of an Article III court by retroactive legislation." *Plaut*, 514 U.S. at 230, 115 S.Ct. 1447. In light of this historical pattern, and as with retroactive legislation generally, *see Landgraf,* 511 U.S. at 277–80, 114 S.Ct. 1483, the court will not read a statute retroactively to alter a final judgement absent an express statement of intent.

9. *Saco River Cellular, Inc. v. FCC*, 133 F.3d 25 (D.C.Cir.1998), is not to the contrary. In that case, the mandate called for a remand to afford the FCC an opportunity to provide a better explanation for its waiver of a financial reporting requirement. *See Northeast Cellular Tel. Co. v. FCC*, 897 F.2d 1164, 1167 (D.C.Cir.1990). Hence, the FCC's subsequent decision to award a license to a different applicant stemmed from its own reconsideration of the case rather than a judicial order compelling a specific result. The direction to "remedy this inconsistency" in *Freeman Engineering* is not comparable; it afforded the FCC no opportunity to develop better reasons for denying QUALCOMM's application, much less to reevaluate QUALCOMM's application. Rather, the court's instruction was clear from context: both Omnipoint and QUALCOMM had sought preferences on the basis of technological modifications on which work had commenced before the FCC had promulgated its pioneer's preference rules. Yet the FCC had denied QUALCOMM a preference on this basis while granting Omnipoint a preference, and Congress had barred the FCC from rescinding Omnipoint's preference. While the court afforded the FCC the opportunity to reevaluate its interpretation of its rules—either to abandon its "newly developed" and "questionable" interpretation of its preference rules that it applied only to QUALCOMM or retain that interpretation—it required in any event that the FCC grant QUALCOMM a preference. No such relief was obtained by the prevailing party in *Saco River*.

ting settled expectations. It imposed a new requirement that pioneers pay for part of the value of the spectrum they received, and it added a sunset provision ending the FCC's authority to grant pioneer's preferences. Significantly for our purposes, Congress also directed the FCC not to reconsider the pioneer's preference grants that it had approved in the *Third Report and Order* and not to delay by more than 15 days the issuance of licenses based on such grants; it also prohibited any further administrative or judicial review of the preferences that had already been granted. *See* 47 U.S.C. § 309(j)(13)(E)(i). In so doing, Congress made clear its intent not to undo the settled expectations of APC, Cox, and Omnipoint based on final agency action granting their pioneer's preferences. There is nothing in the legislative history to suggest that Congress nevertheless intended to interfere with settled expectations derived from a final judicial mandate directing agency action. The House Report expressly stated that the provision finalizing the grants in the *Third Report and Order* was not intended to "affect the rights of persons who have been denied a pioneer's preference," such as QUALCOMM; those persons could still pursue further administrative and judicial review of the denial of their applications. H.R.Rep. No. 103–826, pt. 2, at 8 (1994). So too, nothing suggests that when Congress advanced the sunset date in 1997, it intended to upset settled expectations much less undo the vested rights of an applicant that had already obtained an entitlement to a pioneer's preference under a judicial mandate with which the FCC was obliged to comply under § 402(h).

Accordingly, we grant QUALCOMM's petition and remand to the FCC "forthwith" to grant a pioneer's preference to QUALCOMM and to take prompt action to identify a suitable spectrum and award QUALCOMM the license for it.