# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued April 17, 2009         Decided June 26, 2009

No. 08-1067

ALVIN LOU MEDIA, INC.,
APPELLANT

v.

FEDERAL COMMUNICATIONS COMMISSION,
APPELLEE

On Appeal from Orders
of the Federal Communications Commission

*Dennis J. Kelly* argued the cause and filed the briefs for appellant.

*C. Grey Pash*, *Jr.*, Counsel, Federal Communications Commission, argued the cause for appellee. With him on the brief were *Joseph R. Palmore*, Deputy General Counsel, and *Daniel M. Armstrong*, Associate General Counsel.

Before: GINSBURG, ROGERS and KAVANAUGH, *Circuit Judges*.

Opinion for the Court by *Circuit Judge* ROGERS.

ROGERS, *Circuit Judge*: This appeal involves the Federal Communications Commission's competitive auction procedures for granting construction permits and licenses for AM radio broadcast stations. In contrast to the procedures for comparative hearings, the Commission determined in 1998 to defer full technical reviews of applications until after the auction among mutually exclusive applications is conducted, and then to review only the winning bidder's application. Pre-auction review of engineering data would be limited to determining mutual exclusivity and geographic preferences under 47 U.S.C. § 307(b). Alvin Lou Media ("ALM") appeals the denial of its requests for reconsideration of the mutually exclusive designation of the application filed by Powell Meredith Communications Company ("PMCC") for a radio station in the Las Vegas, Nevada area, and for a stay of the auction. ALM argued to the Commission that because PMCC's application proposed a station that could not be constructed or operated without violating non-interference rules, spectrum protection restrictions, and a treaty with Mexico, the application should have been dismissed. On appeal, ALM contends that the Commission's refusal to consider patent and disqualifying application defects prior to making a § 307(b) determination, 47 U.S.C. § 307(b), was contrary to the mandate in § 309(j)(5) of the Communications Act, 47 U.S.C. § 309(j)(5), and arbitrary and capricious under the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 et seq.

Although ALM refused to participate in the auction, we hold it has standing to appeal the denial of its requests for reconsideration. ALM's refusal was based on its view that the Commission's failure to dismiss a technically infeasible application was an error of law. Absent the alleged error, ALM's application would have been entitled to consideration as a "singleton" and there would have been no auction. The right of a disappointed bidder in a government auction to a legally

valid procurement process, *see U.S. Airwaves, Inc. v. FCC*, 232 F.3d 227, 232 (D.C. Cir. 2000), applies no less to a disappointed participant in an auction process challenging rules as placing it at a competitive disadvantage, *DIRECTV, Inc. v. FCC*, 110 F.3d 816, 829-30 (D.C. Cir. 1997).

However, ALM's contentions fail on the merits. Section 309(j)(5), 47 U.S.C. § 309(j)(5), contemplates that the Commission may establish standards of acceptability for filing an application that differ from the standards for granting a license or permit. To participate in an auction, a bidder need only submit "such information and assurances as the Commission may require," to show its application is "acceptable for filing." 47 U.S.C. § 309(j)(5). By contrast, to be granted a license or permit, a bidder must satisfy the standards of 47 U.S.C. §§ 309(a), 308(b), and 310. *Id.* The Commission's pre-auction procedures, which rely on applicant certifications of feasibility and post-auction monetary sanctions for deficient winning applications, were neither contrary to § 309(j)(5) nor unreasonable. Its explanation of the decision to defer full technical review — to promote expeditious deployment of new broadcasting services to the public and to conserve Commission resources — was "a satisfactory explanation," *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983), for the choice it made. *See FCC v. Fox Television Stations, Inc.*, 129 S.Ct. 1800, 1810-11 (2009). Although ALM's experience points up shortcomings in deferring technical review, the choice made by the Commission was within the broad discretion vested by Congress in 1997 when it expanded the Commission's auction authority.[1] Further, the Commission's

---

[1] By notice of proposed rulemaking issued the next business day following oral argument in the instant case, the Commission has indicated that its view of pre-auction technical review has evolved to be more or less aligned with ALM's views of needed pre-auction

denial of ALM's petitions for reconsideration was not arbitrary or capricious or contrary to law. Accordingly, we affirm.

**I.**

No person may operate or construct a radio station without a license from the Commission. 47 U.S.C. § 301. Prior to the decision in *Bechtel v. FCC*, 10 F.3d 875 (D.C. Cir. 1993), and enactment of section 3002(a) of the Balanced Budget Act of 1997, Pub. L. No. 105-33, 111 Stat. 251, 258-59 (1997), the Commission employed comparative hearings to determine whether permits and operating licenses would be granted. In *Bechtel*, this court held that the integration preference applied in comparative hearings was arbitrary and capricious. *See Bechtel*, 10 F.3d at 878-87. In 1997 Congress expanded the Commission's auction authority, amending the Communications Act to provide that "[i]f . . . mutually exclusive applications are accepted . . . , then . . . the Commission shall grant the license or permit to a qualified applicant through a system of competitive bidding . . . ." 47 U.S.C. § 309(j)(1).

In 1998, the Commission promulgated the auction procedures. *See Implementation of Section 309(j) of the Communications Act – Competitive Bidding for Commercial Broadcast and Instructional Television Fixed Service Licenses*, 13 F.C.C.R. 15,920 (1998) ("*Auctions First Report & Order*"). The Commission determined that rather than conducting full

---

technical review. *Notice of Proposed Rulemaking, Policies to Promote Rural Radio Service and to Streamline Allotment and Assignment Procedures*, 74 Fed. Reg. 22,498 (May 13, 2009). This proposed change, which would govern "applicants in future AM broadcast auctions," *id.* at 22,503, does not affect whether the Commission's interpretation of § 309(j)(5) in 1998 was permissible. *Cf. Bechtel*, 10 F.3d at 887.

technical reviews of all applications prior to an auction, it would examine the technical data in advance only to determine whether applications were mutually exclusive and entitled to a preference pursuant to § 307(b). After the auction it would review in detail only the winning bidder's application. All applicants would file a short-form application, FCC Form 175, *see id.* at 15,974, ¶ 141, certifying they were legally, technically, and otherwise qualified to be granted a permit or license, *id.* at 15,979, ¶ 152. The winning bidder would file a long-form application, typically FCC Form 301, which would be reviewed for compliance with all relevant requirements, including technical feasibility. *Id.* at 15,984-86, ¶¶ 163-66. A permit or license would be granted only after any petitions to deny were denied or dismissed and the Commission was satisfied the applicant was qualified. *Id.* at 15,985-86, ¶ 166. Absent mutual exclusivity, if an applicant was granted a dispositive § 307(b) preference, the application would be deemed a "singleton" and no auction would be conducted. *See id.* at 15,964-65, ¶ 120. The Commission explained that deferring full technical review until after the auction would minimize delay, encourage more bidders to participate in the auction because only a short-form application would be required to participate, and facilitate expeditious deployment of new broadcasting service to the public, in keeping with § 309(j)(3)(A).[2] *Id.* at 15,978-79, ¶ 151; *see also id.* at 15,979 n.167.

The Commission also established procedures to accommodate the new competitive auction regime with § 307(b), which requires the Commission "[i]n considering applications

---

[2] Section 309(j)(3)(A) directs the Commission to promote "the development and rapid deployment of new technologies, products, and services for the benefit of the public, including those residing in rural areas, without administrative or judicial delays . . . ." 47 U.S.C. § 309(j)(3)(A).

for licenses . . . [to] make . . . distribution of licenses, frequencies, hours of operation, and of power among the several States and communities as to provide a fair, efficient, and equitable distribution of radio service to each of the same." 47 U.S.C. § 307(b). In keeping with this directive, the Commission determined the staff would undertake a "traditional Section 307(b) analysis" prior to auction. *Id.* at 15,965, ¶ 120. Thus, in the instant case, upon identifying the mutually exclusive applications, the Media Bureau requested information from applicants regarding the area and population proposed to be served. *AM Auction No. 32 Mutually Exclusive Applicants Subject to Auction*, Rep. No AUC-00-32-E (Auction No. 32), at 3 (Oct. 27, 2000). Such amendment was to be based on the technical proposal in the AM Auction filing window application. *Id.*; *see also* 47 C.F.R. § 1.2105; *Auctions First Report & Order*, 13 F.C.C.R. at 15,976, ¶ 145. If the § 307(b) determination is dispositive and there are no competing applications for the same community, then staff will grant the application proposing to serve the community with the greater need and dismiss others as ineligible. *Auctions First Report & Order*, 13 F.C.C.R. at 15,965, ¶ 120. If no § 307(b) determination is dispositive or there are competing applications, the applications would be included in an auction. *Id.*

This was the auction regime in place when, during the filing window for Auction No. 32, ALM, PMCC, and Victor A. Michael ("Michael"), along with others, filed applications for new AM broadcast radio stations; ALM and PMCC sought to operate in the Las Vegas area, Michael in Cheyenne, Wyoming. The Media Bureau determined that these three applications were mutually exclusive and that none was entitled to a dispositive § 307(b) preference. ALM's Spring Valley proposal was found not entitled to a first-local-service preference because Spring Valley, Nevada was not sufficiently independent of Las Vegas. The Media Bureau also determined that Las Vegas was entitled

to a § 307(b) preference over Cheyenne, and so ALM and PMCC would proceed to auction.

ALM and Michael sought reconsideration, arguing that PMCC's application was technically deficient because it would cause disruptive interference in violation of Commission rules, spectrum protection requirements, and international treaty agreements. ALM argued it was improper for the Media Bureau not to dismiss PMCC's application prior to the auction given the identified defects. ALM, Pet. for Recons., AM Auction No. 32, MX Group 38, at 8-12, ¶¶ 14-19 (May 10, 2002). Deferring review of the technical merits until after the auction under the circumstances, ALM continued, "propagates a sham auction, and falsely insinuates that the [Commission] has no present knowledge of the illegal service status of PM[CC]'s Las Vegas application." *Id.* at 14, ¶ 26. The Media Bureau denied ALM's request for reconsideration and its motion for a stay of the auction, noting the Commission's procedures deferring full technical review until after an auction. Letter from Peter H. Doyle, Chief, Audio Division, Office of Broadcast License Policy, Media Bureau, to Dave Garey, Secretary, Alvin Lou Media, Inc., et al. (Aug. 15, 2002).

ALM refused to participate in the auction, explaining that while it remained "an applicant in good standing" for Auction 32, its "legal rights [would be] violated if it did specifically participate" in the December 10, 2002 auction with PMCC. ALM, Decl. That It Remains a Participant in Good Standing, AM Auction No. 32, MX Group 38, at 2 (Dec. 7, 2002). As the only bidder, PMCC "won," but its long-form application was ultimately dismissed at PMCC's request.[3] In 2004, the

---

[3] *See* FCC, Public Notice, Broadcast Actions, Report No. 46106 (Nov. 7, 2005), *available at* http://hraunfoss.fcc.gov/edocs_public/attachmatch/DOC-262051A1

Commission affirmed the Bureau's 2002 denials of ALM's petition and motion to stay the auction. FCC, Mem. Op. & Order Denying Application for Review 3, ¶ 5 (Jun. 30, 2004). In 2008, the Commission denied ALM's petition for reconsideration of the 2004 Order. *See* FCC, Mem. Op. & Order on Recons. (Jan. 17, 2008).

## II.

We first address two threshold questions, standing and timeliness.

### A.

The Commission maintains that ALM lacks standing because it voluntarily declined to participate in the auction and therefore suffered no injury in fact as a result of the auction. We hold that ALM's non-participation in the auction does not defeat its standing. "The 'irreducible constitutional minimum' for Article III standing is that the appellant was injured in fact, that its injury was caused by the challenged conduct, and that the injury would likely be redressed by a favorable decision of the court." *21st Century Telesis Joint Venture v. FCC*, 318 F.3d 192, 197-98 (D.C. Cir. 2003).

---

.pdf. Despite having its Auction 32 application dismissed, PMCC filed an application for a new station in a Las Vegas suburb in 2004. Although its new application also was deemed mutually exclusive with other applications, PMCC was eligible for settlement and the Commission formally accepted PMCC's long-form application in 2008. *See* FCC, Public Notice, Broadcast Applications, Report No. 26754 (June 10, 2008), *available at* http://fjallfoss.fcc.gov/edocs_public/attachmatch/DOC-282767A1.pdf.

Addressing government auctions, this court has held:

> "[A] bidder in a government auction has a 'right to a legally valid procurement process'; a party allegedly deprived of this right asserts a cognizable injury." A disappointed bidder need not show that it would be successful if the license were auctioned anew, but only that it was able and ready to bid and that the decision of the Commission prevented it from doing so on an equal basis. The bidder may satisfy the requirement of redressability by showing that "'it is ready, willing, and able' to participate in a new auction should it prevail" in court.

*High Plains Wireless, L.P. v. FCC*, 276 F.3d 599, 605 (D.C. Cir. 2002) (quoting *U.S. Airwaves, Inc. v. FCC*, 232 F.3d 227, 232 (D.C. Cir. 2000)) (internal citations omitted); *accord DIRECTV*, 110 F.3d at 829.

ALM is in much the same position as DIRECTV, which the court held had standing even though it had not participated in an auction because the Commission's rules put DIRECTV at a "substantial competitive disadvantage" and "as a practical matter, precluded [it] from participating in the auction." *DIRECTV*, 110 F.3d at 830. Under the rules, had DIRECTV won the auction it "would have been required to divest itself of [a] substantial block of [valuable] channels . . . unless it could get the rule declared unlawful." *Id.* The court concluded DIRECTV "did not have to take the risk that [its] successful bid would be but a costly misstep." *Id.* DIRECTV's injury — the Commission's denial of its right to a legally valid procurement process — would be redressed if the Commission afforded DIRECTV an opportunity to bid "in a legally valid bidding contest." *Id.* at 830.

Much like DIRECTV, ALM was a disappointed participant in the procurement process. ALM timely filed an application and was denied a § 307(b) preference. The Media Bureau declined to consider ALM a "singleton," as ALM would have been had its interpretation of § 307(b) prevailed and PMCC's application been dismissed upon pre-auction review. Assuming for purposes of standing, as we must, that ALM would prevail on the merits, *see City of Waukesha v. EPA*, 320 F.3d 228, 235 (D.C. Cir. 2003), the Commission's pre-auction procedures deprived ALM of the right to a valid procurement process. By allowing a technically deficient application to be designated mutually exclusive and to compete against ALM's application, the Commission's rules deferring technical review until after the auction was conducted put ALM at a competitive disadvantage. ALM argued to the Commission it would have been "forced to not only bid against PM[CC]'s illegal service, but also to respond to any mock bids PM[CC] might choose to make to inflate the price AL[M] would ultimately have to pay." ALM, Pet. for Recons., AM Auction No. 32, MX Group 38, at 16, ¶ 31 (May 10, 2002). For standing purposes it suffices that ALM participated in the auction process up to the point it would have had to make an up-front payment to participate in the auction and bid against an invalid application. By the time ALM voluntarily withdrew from participating in the auction, it had already been subjected to the purportedly invalid procurement process and been injured in fact. ALM's injury would be redressed by an opportunity to participate in a procurement process involving pre-auction review for technical merit. *See DIRECTV*, 110 F.3d at 829-30.

The Commission's suggestion that ALM might be financially disqualified in a new application process and the injury not redressable is not well taken. Standing "is determined as of the date an action is filed." *U.S. Airwaves, Inc.*, 232 F.3d at 232. The Commission's August 2008 determination that

ALM's sole owner was unable to pay certain debts, based on review of the owner's financial situation in 2004 and 2005, *see Fireside Media, Order*, 23 F.C.C.R. 13,138 (Aug. 22, 2008), does not speak to ALM's owner's financial situation in February 2008, when ALM filed its appeal in this court. Further, that determination involved the financial situation of Fireside Media, not ALM. ALM's statement to the court that it "can demonstrate that it is financially qualified to construct and operate as proposed when it files its 'long form' 301 application," Reply Br. at 17, suffices for purposes of this appeal to show that it is ready, willing, and able to participate in a new process and that its injury is redressable. *See U.S. Airwaves*, *Inc*., 232 F.3d at 232.

## B.

The Commission also appears to suggest that ALM's challenge to the competitive auction procedures is not properly before the court. It offers that the challenge could have been brought as a petition for review of the rules immediately after they were promulgated or as a petition for a new rulemaking. We hold that ALM's challenge is properly before the court.

Although ALM could have sought immediate review of the rules or filed a petition for a rulemaking, nothing in *Grid Radio v. FCC*, 278 F.3d 1314, 1320 (D.C. Cir. 2002), or *Meredith v. FCC*, 809 F.2d 863, 873 (D.C. Cir. 1987), on which the Commission relies, precluded ALM from seeking review of the fast-track auction rules once the Commission applied them to ALM. This court "permit[s] both constitutional and statutory challenges to an agency's application or reconsideration of a previously promulgated rule, even if the period for review of the initial rulemaking has expired." *Graceba Total Commc'ns, Inc. v. FCC*, 115 F.3d 1038, 1040 (D.C. Cir. 1997); *see also NLRB Union v. Fed. Labor Relations Auth.*, 834 F.2d 191, 195-97 (D.C. Cir. 1987); *Functional Music, Inc. v. FCC*, 274 F.2d 543, 546

(D.C. Cir. 1958). Because the Commission's threshold contentions lack merit, we turn to the merits.

## III.

ALM's primary contention is that § 309(j)(5) of the Communications Act requires the Commission to undertake technical review of all applications before allowing an applicant to participate in an auction. It reasons that because Congress required the Commission not to grant an application unless it is acceptable for filing, an application that proposes a station that would cause destructive inference with pre-existing stations is always unacceptable for filing. In ALM's view, if, under the comparative hearings system "a *prima facie* application defect required the Commission to deny a hearing to that application," Appellant's Br. at 18; *see Saul M. Miller*, 1 F.C.C.2d 1388, 1389 (1965), "then it is equally so that a *prima facie* application defect requires the Commission to reject that application without it being included in an auction proceeding with other applications whose basic qualifications are *prima facie* not defective," Appellant's Br. at 18.

When the Commission interprets a statute it administers, the court reviews its interpretation under the familiar two-step framework of *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). Under step one, where a statute "has directly spoken to the precise question at issue," *id.* at 842, the court and the agency "must give effect to the unambiguously expressed intent of Congress," *id.* at 843. Under step two, when the statute is silent or ambiguous regarding the specific question, the court asks "whether the agency's answer is based on a permissible construction of the statute." *Id*

Section 309(j)(5), on its face, does not require the Commission to review an application for technical defects before

designating an application as mutually exclusive and including it in an auction. The text and structure of § 309(j)(5) draw a distinction between the prerequisites for participation in an auction and the requirements for granting a license or permit.[4] To participate in an auction, a bidder need only submit "such information and assurances *as the Commission may require*," to show its application is "acceptable for filing." 47 U.S.C. § 309(j)(5) (emphasis added). By contrast, to be granted a license or permit, a bidder must satisfy the requirements of 47 U.S.C. § 309(a), regarding "the public interest, convenience, and necessity"; 47 U.S.C. § 308(b), regarding an applicant's

---

[4] Section 309(j)(5) provides:

> No person shall be permitted to participate in a system of competitive bidding pursuant to this subjection unless such bidder submits such information and assurances as the Commission may require to demonstrate that such bidder's application is acceptable for filing. No license shall be granted to an applicant selected pursuant to this subsection unless the Commission determines that the applicant is qualified pursuant to subsection (a) of this section and sections 308(b) and 310 of this title [setting conditions for applications and restrictions on license ownership, respectively]. Consistent with the objectives described in paragraph (3) [regarding the design of systems of competitive bidding], the Commission shall, by regulation, prescribe expedited procedures consistent with the procedures authorized by subsection (i)(2) of this section [regarding assignment by random selection] for the resolution of any substantial and material issues of fact concerning qualifications.

47 U.S.C. § 309(j)(5).

"citizenship, character, and financial, technical, and other qualifications"; and 47 U.S.C. § 310, which imposes restrictions on ownership by foreign governments and aliens. *Id.* § 309(j)(5). As § 309(j)(5) contemplates the possibility of different standards for participation in an auction and the grant of a permit or license, the merit of ALM's contention hinges on the reasonableness of the Commission's determination of what is required for an application to be "acceptable for filing."

By Commission rule, applicants for licenses or permits must make certifications in the short-form applications as to legal, technical, financial, and other qualifications of the applicant. *Auctions First Report & Order*, 13 F.C.C.R. at 15,975, ¶ 144. Further, successful bidders are subject to fines if their applications could not be granted due to technical or legal defects, *id.* at 15,979, ¶ 152. While ALM suggests an intermediate form of up-front technical review, i.e., review of a short-form application for facial defects, § 309(j)(5) did not mandate the Commission to adopt such an approach. Although compliance with the Commission's technical regulations is one of the requirements for granting a license or permit, *see* 47 U.S.C. § 309(j)(5) (cross-referencing § 308(b)), neither § 309(j)(5) nor the sections it cross-references mention such a requirement as a prerequisite for participation in an auction. Section 308(b) addresses the qualifications for the granting of licenses and vests discretion in the Commission with respect to the contents of applications;[5] it does not even imply conditions

---

[5] Section 308(b) provides:

All applications for station licenses, or modifications or renewals thereof, shall set forth such facts as the Commission by regulation may prescribe as to the citizenship, character, and financial, technical, and other qualifications of the applicant to operate the station; the ownership and location of

for eligibility to participate in an auction and consequently has no bearing on the timing of the Commission's determination that an applicant may participate in an auction. Indeed the cross-reference to § 309(i)(2), governing applications granted through lottery,[6] lends some support for the Commission's choice of deferring grantability determinations until after an auction as it contemplates the Commission will consider an applicant's qualifications under § 309(a) and § 308(b) after the successful applicant has been selected, allowing the Commission to then conduct a hearing if "substantial and material questions of fact exist concerning such qualifications"and to forego consideration

---

> the proposed station and of the stations, if any, with which it is proposed to communicate; the frequencies and the power desired to be used; the hours of the day or other periods of time during which it is proposed to operate the station; the purposes for which the station is to be used; and such other information as it may require. The Commission, at any time after the filing of such original application and during the term of any such license, may require from an applicant or licensee further written statements of fact to enable it to determine whether such original application should be granted or denied or such license revoked. Such application and/or such statement of fact shall be signed by the applicant and/or licensee in any manner or form, including by electronic means, as the Commission may prescribe by regulation.

47 U.S.C. § 308(b).


[6] Section 309(i)(2) provides, in relevant part, that "[w]hen substantial and material questions of fact exist concerning [an applicant's] qualifications [to be granted a permit or license], the Commission shall conduct a hearing . . . ." 47 U.S.C. § 309(i)(2). The Commission's lottery authority expired July 1, 1997, except for licenses or permits for noncommercial educational or public broadcast stations. *See* 47 U.S.C. § 309(i)(5)(A).

of the unsuccessful applicants for consistency with the public interest under § 309(a).

In urging that "an application which proposes to create destructive interference to pre-existing stations is always unacceptable for filing," Appellant's Br. at 18, ALM overlooks the broad discretion Congress reposed in the Commission as evidenced by the phrase "as the Commission may require," 47 U.S.C. § 309(j)(5), to determine the requirements for an application to be "acceptable for filing," and thus eligible to participate in an auction. Discretion contemplates alternative choices, and whatever the practicality of ALM's position may be, the court's role is not to second-guess the Commission's choice where it lies within the range of reasonable alternatives. *See EarthLink, Inc. v. FCC*, 462 F.3d 1, 12 (D.C. Cir. 2006); *cf. Kickapoo Tribes of Indians of Kickapoo Reservation in Kansas v. Babbitt*, 43 F.3d 1491, 1497 (D.C. Cir. 1995). By requiring the applicants to certify technical feasibility and regulatory compliance before auctions, and providing for the imposition of monetary penalties on winning bidders whose applications were ultimately dismissed, the Commission decreased the chance that technically defective or otherwise noncompliant applications would be included in an auction. It balanced the costs of delay against the benefits of greater assurance that all bidders were qualified for a license and concluded, reasonably and within an area of its expertise, that the former outweighed the latter given Congress's instruction for expedition.

ALM also contends that a § 307(b) determination, which the Commission said it would make prior to an auction, contemplates a finding that an application is technically feasible. The Commission's practice, ALM continues, of not examining the technical feasibility of the proposed operation before the auction would defeat the purpose of § 307(b), which requires the Commission to "make such distribution of licenses,

frequencies, hours of operation, and of power among the several States and communities as to provide a fair, efficient, and equitable distribution of radio service to each of the same." 47 U.S.C. § 307(b).

Regardless of the merits of ALM's view of the purpose underlying this directive, the Supreme Court has underscored the scope of the Commission's discretion in holding the Commission need not ensure that applicants can equally well serve the communities they propose to serve before deciding which community is entitled to a § 307(b) preference. *See FCC v. Allentown Broad. Corp.,* 349 U.S. 358 (1955). The Court reasoned the Commission had discretion to conclude that doing so could harm the community with the greater need by denying it the opportunity to have increased broadcasting services simply by the fortuity of which applicant sought to serve that community. *See id.* at 362. On similar reasoning, the Commission need not consider the technical qualifications of each applicant before making a § 307(b) preference determination. The text of § 307 is silent regarding both what the Commission should consider in making § 307(b) determinations and the order in which the Commission should address the technical qualifications of an applicant seeking a § 307(b) preference. The absence of statutory procedural mandates supports the conclusion that the Commission's auction procedures deferring full technical review of applications do not conflict with § 307(b).

ALM's reliance on the comparative hearing precedent does not advance its position. It maintains that the Commission's prior treatment of broadcast applications would have required dismissal of PMCC's application because its proposal would have resulted in destructive interference to existing AM broadcasting stations. ALM points to Commission precedent from before § 309(j)(1) was amended in 1997 that only

18

applications setting forth technically feasible proposals were entitled to consideration under § 307(b).[7] It notes that in *Simmons v. FCC*, 145 F.2d 578 (D.C. Cir. 1944), this court upheld the denial of one of two competing applications because the proposed operations would cause interference to other stations, observing that "[r]elative consideration is meaningless unless there are two applications either of which, considered alone, might be granted," *id.* at 579. But Congress has not required that competitive auctions include advance technical review as in the prior comparative hearing regime. The Commission could reasonably adopt other means to facilitate § 307(b) analysis without requiring that short-form applications be amended to include a further showing of feasibility of the proposed operations for purposes of a full technical analysis reserved for applications submitted by winning bidders and "singletons." Restricting the additional information the Commission required to make § 307(b) determinations was consistent with the two-standard structure embodied in § 309(j)(5).

Consequently, as a general matter, the Commission's rules deferring full technical review until after an auction are not unlawful under either § 309(j)(5) or § 307(b), but rather constitute a reasonable exercise of its discretion. The Commission explained that deferring detailed technical review until after the auction would minimize delay, encourage more bidders to participate in the auction, and facilitate expeditious

---

[7] *See, e.g.*, *Wright & Maltz, Inc. v. FCC*, No. 18222, 2 Rad. Reg. (P&F) 2d 2056 (D.C. Cir. 1964) (affirming *Wright & Maltz, Inc.*, 35 F.C.C. 192 (1963)); *Goodson-Todman Broad., Inc.*, 35 Rad. Reg. 2d 1219 (1975); *Martin Lake Broad. Co.*, 26 F.C.C.2d 963, 969 n.10 (1970); *Saul M. Miller*, 1 F.C.C.2d 1388, 1389 (1965), *Garo W. Ray*, 1 F.C.C. 1038, 1039 (1964); *Louis Adelman*, 28 F.C.C. 432, 434 (1960).

deployment of new broadcasting service to the public. *Auctions First Report & Order*, 13 F.C.C.R. at 15920, ¶ 151. Given its experience with up-front technical review under the comparative hearing regime, the Commission could reasonably conclude the benefits of expeditious deployment and expanded participation in the auction process outweighed the risk that in a small number of cases, winning bidders' applications would ultimately be dismissed even when other bidders might have been able to secure a license. It was also reasonable for the Commission to conclude that avoiding the costs and delays associated with pre-auction technical review was consistent with its expanded auction authority.

## IV.

ALM's contentions that the Commission's denials of its requests for reconsideration were arbitrary and capricious under the APA fare no better. Under the APA, the court will uphold an agency's interpretation and implementation of its own procedures unless they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The Commission's application of its auction procedures to ALM was not arbitrary and capricious or otherwise not in accordance with law.

ALM contends, first, that because Commission staff knew or should have known that the PMCC application was defective as it would pose destructive interference and operation would be inconsistent with international treaties, it should have dismissed the application before the auction. However quickly the Commission might have detected the defects in PMCC's application, the Commission's goal in setting up the streamlined and limited pre-auction review procedures was to promote efficiency across the board in all auctions, not just the one here. That a more thorough pre-auction review would have been easy

here and possibly even been more efficient does not undermine the Commission's conclusion that a deferral procedure would be sensible in the large majority of cases. *Cf. Weinberger v. Salfi*, 422 U.S. 749, 776-77 (1975).

Somewhat more forcefully, ALM contends, second, that because the Commission does not review applications for technical feasibility prior to the auction, an applicant can submit a proposal with unfeasible but seemingly impressive qualifications in order to participate in and win the auction, but then change the technical proposal after the auction. ALM points out that in other contexts, the Commission requires a successful applicant to construct and operate technical facilities "substantially as proposed" and does not allow those successful applicants to "downgrade service to the area on which the preference is based for a period of four years of on-air operations, " 47 C.F.R. § 73.7005(b).

However, ALM overlooks that the Commission has, through different mechanisms, imposed requirements designed to deter applicants from submitting over-ambitious and unrealistic applications and to punish those who do. Modification of pre-auction applications after auctions by winning bidders is limited. *See, e.g.*, 47 C.F.R. §§ 73.3573(f)(5)(iii), 73.3522(a)(3). A winning bidder risks being subject to withdrawal, default, and disqualification payments, *see* 47 C.F.R. § 1.2104(g); *Auctions First Report & Order*, 13 F.C.C.R. at 15,979, ¶ 152. Applicants are required to certify in the short-form application prior to auction that they are "legally, technically, financially and otherwise qualified pursuant to section 308(b) of the Communications Act of 1934, as amended." 47 C.F.R. § 1.2105. Given these disincentives for game-playing, the auction procedures established in 1998 deferring full technical review until after the auction are not arbitrary and capricious. This is true even though comments

during the 1998 rulemaking opposing deferral of technical reviews until after the auction identified concerns similar to those ALM raised before the Commission, such as the opportunity for manipulating the process and the risk of a resulting "sham auction," ALM, Pet. for Recons., AM Auction No. 32, MX Group 38, at 14, ¶ 26 (May 10, 2002). Congress gave the Commission broad discretion in fashioning an auction regime and the Commission's choice lies within the range of its discretion under its expanded auction authority. That the Commission may have garnered experience over the years to bring its view closer to ALM's position that some form of pre-auction technical review is necessary, *see supra* note 1, is of no moment.

Finally, ALM's contention that it would be arbitrary and capricious for the Commission to claim it made a "careful" analysis of the § 307(b) considerations for the auction in which ALM was intending to participate appears to reprise its contention that the Commission acted unlawfully by not considering the technical feasibility of PMCC's application prior to the auction. To the extent it differs, the record shows that the Bureau received detailed submissions from the parties, even requesting more information after receiving the initial submissions, and then made specific findings and conclusions as to the needs of the relevant communities. ALM's reliance on *Achernar Broadcasting Company v. FCC*, 62 F.3d 1441 (D.C. Cir. 1995), is misplaced as the Commission in that case had promulgated a regulation under the National Radio Astronomy Observatory ("NRAO") that it "will consider all aspects of the problem" when addressing an objection on the grounds that granting a license would cause interference to the NRAO, 47 C.F.R. § 73.1030(a). *See* 62 F.3d at 1444-48. Although *Achernar* is relevant to the extent it stands for the proposition that the Commission must engage in reasoned decisionmaking and consider the entire record in an adjudicative hearing, it is

readily distinguished on a variety of grounds, including that, unlike the fast-track auction regime, there was an "all aspects" regulatory requirement, and at issue was the Commission's decision to grant a construction permit.

Accordingly, we affirm the orders denying reconsideration.