# United States Court of Appeals for the Federal Circuit

---

**ALPINE PCS, INC.,**
*Plaintiff-Appellant*

**v.**

**UNITED STATES,**
*Defendant-Appellee*

---

2017-1029

---

Appeal from the United States Court of Federal Claims in No. 1:16-cv-00001-CFL, Judge Charles F. Lettow.

---

Decided: January 2, 2018

---

NORMAN PATTIS, The Pattis Law Firm, LLC, Bethany, CT, argued for plaintiff-appellant.

PATRICIA M. MCCARTHY, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, argued for defendant-appellee. Also represented by CHAD A. READLER, ROBERT E. KIRSCHMAN, JR.

---

Before MOORE, REYNA, and TARANTO, *Circuit Judges.*

TARANTO, *Circuit Judge.*

In 1996, the Federal Communications Commission (FCC) awarded spectrum licenses to Alpine PCS, Inc., for use in the provision of wireless telecommunications services. Alpine's failure to make required payments for those licenses in 2002 triggered automatic cancellation of the licenses under FCC regulations. In addition to taking other steps in response, Alpine sought relief from the FCC and, on review under the Communications Act, 47 U.S.C. § 402(b)(5), from the United States Court of Appeals for the District of Columbia Circuit. Eventually, in 2016, Alpine filed this action against the United States under the Tucker Act, 28 U.S.C. § 1491(a)(1), in the United States Court of Federal Claims. Alpine alleged that the FCC breached contractual obligations in canceling the licenses and that the cancellation was a taking for which Alpine was entitled to just compensation under the Takings Clause of the Fifth Amendment to the U.S. Constitution. The Court of Federal Claims dismissed both of Alpine's claims for lack of jurisdiction under the Tucker Act. We affirm, concluding that the Communications Act provides a comprehensive statutory scheme through which Alpine could raise its contract claims and could challenge the alleged taking and receive a remedy that could have provided just compensation in this case, foreclosing jurisdiction under the Tucker Act.

I

A

In May 1996, Alpine submitted bids in an FCC spectrum-license auction and won two 10-year "personal communication services" licenses. Alpine bid approximately $8.9 million for one license and approximately $17.3 million for the other.

As a small business, Alpine was eligible to pay its bid amounts in installments over the term of the licenses.

*See* 47 C.F.R. § 1.2110(e) (1995); 59 Fed. Reg. 44,272, 44,298–99 (Aug. 26, 1994), *amended by* 60 Fed. Reg. 52,865, 52,865 (Oct. 11, 1995).  In September 1996, Alpine issued promissory notes to the FCC, providing for quarterly payments from December 1996 through September 2006.  Alpine also executed security agreements designating the licenses as collateral to secure the payment obligation.

The notes contain two provisions highlighted by the parties.  One describes the process of default:

> A default under this Note ("Event of Default") shall occur upon . . . non-payment by [Alpine] of any Principal or Interest on the due date as specified hereinabove if [Alpine] remains delinquent for more than 90 days and
>
> (1) [Alpine] has not submitted a request, in writing, for a grace period or extension of payments, if any such grace period or extension of payments is provided for in the then-applicable orders and regulations of the Commission; or
>
> (2) [Alpine] has submitted a request, in writing, for a grace period or extension of payments, if any such grace period or extension of payments is provided for in the then-applicable orders and regulations of the Commission, and following the expiration of the grant of such grace period or extension or upon denial of such a request for a grace period or extension, [Alpine] has not resumed payments . . . in accordance with the terms of this Note . . . .

J.A. 21–22; J.A. 29–30.  A second provision states that the "Note[s] shall be governed by and construed in accordance with the Communications Act of 1934, as amended, the then-applicable orders and regulations of the Commis-

sion, and federal law . . . , and nothing in th[ese] Note[s] shall be deemed to release [Alpine] from compliance therewith." J.A. 25; J.A. 33.

The security agreements incorporate the notes' provisions regarding the process of default and identify automatic cancellation of the licenses as one of the FCC's remedies upon default. The security agreements also state that they "shall be governed by and construed in accordance with [the] Communications Act of 1934, as amended, then-applicable Commission orders and regulations, as amended, and federal law." J.A. 42; J.A. 50.

The regulations in effect in September 1996 provided that a licensee "making installment payments . . . shall be in default" if a payment "is more than ninety (90) days delinquent," but could "request that the [FCC] permit a three to six month grace period, during which no installment payments need be made." 47 C.F.R. § 1.2110(e)(4)(i)–(ii) (1995). The FCC could "consider[] whether to grant a request for a grace period" or "approve[] a restructured payment schedule." *Id.* § 1.2110(e)(4)(ii). If the request was denied or the grace period expired without payment, the licenses would automatically cancel and the licensee would be subject to debt collection. *Id.* § 1.2110(e)(4)(iii).

The FCC then amended the regulations, the amendments taking effect in 1998. *See In re Amendment of Part 1 of the Commission's Rules – Competitive Bidding Procedures*, 13 FCC Rcd. 374 (F.C.C. 1997); *Celtronix Telemetry, Inc. v. FCC*, 272 F.3d 585, 586 (D.C. Cir. 2001). The 1998 regulations, instead of requiring a request for a grace period upon default, provided for a 90-day non-delinquency period and a subsequent 90-day grace period—effectively, two 3-month grace periods—as a matter of course. 47 C.F.R. § 1.2110(f)(4)(ii) (1998) ("If any licensee fails to make the required payment at the close of the 90-day period set forth in paragraph (i) of this section, the

licensee will automatically be provided with a subsequent 90-day grace period," and "[l]icensees shall not be required to submit any form of request in order to take advantage of the initial 90-day non-delinquency period and subsequent automatic 90-day grace period."); *see also* 63 Fed. Reg. 2,315, 2,346 (Jan. 15, 1998), *corrected by* 63 Fed. Reg. 12,658, 12,659 (Mar. 16, 1998). But if the licensee did not pay the installment, plus late fees, after the second grace period, the licensee would be declared in default, have its licenses "automatically cancel[ed]," and be subject to debt collection. 47 C.F.R. § 1.2110(f)(4)(iii)–(iv) (1998).

In January 2002, Alpine failed to make its quarterly payment. Under the regulations in effect at that time, Alpine received two 3-month grace periods as a matter of course, and its new payment deadline was July 31, 2002. *See* 47 C.F.R. § 1.2110(g)(4)(i)–(ii) (2000).[1] Unless Alpine paid the full amount, plus late fees, by that date, it would be declared in default, have its licenses "automatically cancel[ed]," and be subject to debt collection. *Id.* § 1.2110(g)(4)(iii)–(iv).

On July 24, 2002, a week before the deadline, Alpine asked the FCC to restructure the payment plan, invoking 31 C.F.R. § 902.2. The FCC acknowledged receipt of that request on July 30, 2002. On July 31, 2002 (the payment deadline), Alpine asked the FCC to waive the automatic cancellation provision of the regulations. *In re Alpine PCS, Inc.*, 22 FCC Rcd. 1492, 1495 (W.T.B. Jan. 29, 2007).

In October 2002, a few months after the expiration of the grace periods, the FCC changed its public database to

---

[1] The relevant provisions of the regulations in effect in 2002 were substantially the same as those in effect in 1998, although appearing in slightly different form and moved from subsection (f) to subsection (g).

show that the licenses had reverted to the FCC. According to Alpine's allegations in this case, however, the FCC assured Alpine that the database change was a clerical error, and the FCC continued to discuss possible payment restructuring with Alpine.

The FCC ultimately denied both the payment-restructuring and waiver-of-cancellation requests. On January 16, 2004, the FCC told Alpine that Alpine was in default and "advised Alpine that the Restructuring Request was being returned to Alpine 'without action.'" J.A. 14; *see also In re Alpine PCS, Inc.*, 25 FCC Rcd. 469, 474 (F.C.C. Jan. 5, 2010). Three years later, on January 29, 2007, the FCC's Wireless Telecommunications Bureau issued an order denying Alpine's waiver and restructuring requests. *In re Alpine*, 22 FCC Rcd. at 1503 & n.2. Alpine timely filed a petition for reconsideration of the Bureau's decision, which the FCC denied on January 5, 2010. *In re Alpine*, 25 FCC Rcd. at 509 (citing 47 U.S.C. § 155(c)(5); 47 C.F.R. § 1.106). Alpine appealed that decision to the D.C. Circuit under 47 U.S.C. § 402(b). The D.C. Circuit summarily affirmed the FCC's decision. *Alpine PCS, Inc. v. FCC*, 404 F. App'x 508 (D.C. Cir. 2010).

B

Several other events and proceedings are relevant here. On April 4, 2008, while Alpine's petition for reconsideration regarding waiver and restructuring was pending before the FCC, the FCC announced a new auction of the licenses, to be held on August 13, 2008. *In re Alpine PCS, Inc.*, 23 FCC Rcd. 10,485, 10,486 & n.1 (F.C.C. July 7, 2008). On April 18, 2008, Alpine asked the FCC to stay the auction until the FCC ruled on the reconsideration petition, but the FCC refused. *Id.* at 10,486, 10,488–92.

In August 2008, Alpine filed for bankruptcy and moved for an automatic stay of the FCC auction. Debtor's Emergency Mot. to Enforce Automatic Stay, *In re Alpine*

*PCS, Inc.*, No. 08-00543 (Bankr. D.D.C. Aug. 18, 2008). The bankruptcy court denied the stay motion, determining that the licenses were not part of the bankruptcy estate. *In re Alpine PCS, Inc.*, No. 08-00543, 2008 WL 5076983, at *4 (Bankr. D.D.C. Oct. 10, 2008), *aff'd*, 404 F. App'x 504 (D.C. Cir. 2010). The FCC re-auctioned the licenses in 2008.

In January 2013, Alpine sued the FCC in the U.S. District Court for the District of Columbia, alleging breach of contract, unjust enrichment, fraud in the inducement, and breach of fiduciary duty, and seeking declaratory judgments of no default and no debt. Compl., *Alpine PCS, Inc. v. FCC*, No. 1:13-cv-000006, at 8–11 (D.D.C. Jan. 3, 2013). Alpine argued that the case was properly before that court because the promissory notes include a forum-selection clause stating that "any legal action or proceeding relating to th[e] note[s], the security agreement[s], or other document[s] evidencing or securing the debt transaction evidenced hereby may only be brought in the United States District Court for the District of Columbia." J.A. 24; J.A. 32. The district court rejected Alpine's argument and dismissed the claim for lack of jurisdiction, concluding, among other things, that the contract claims were essentially an attack on an FCC licensing decision, review of which is committed by statute, 47 U.S.C. § 402(b), to the exclusive jurisdiction of the D.C. Circuit. The D.C. Circuit affirmed the district court's decision. *Alpine PCS, Inc. v. FCC*, 563 F. App'x 788, 788–89 (D.C. Cir. 2014).

C

On January 4, 2016, Alpine brought the present action against the United States in the Court of Federal Claims. Alpine alleged breach of oral and written contract, breach of contract implied in fact, and breach of the duty of good faith and fair dealing (the contract claims). According to Alpine, the FCC breached its contractual

obligations under the notes and security agreements and breached its duty of good faith and fair dealing by automatically canceling Alpine's licenses after the two grace periods, as provided in the amended regulations (described above). Alpine also asserted a constitutional claim under the Fifth Amendment (the takings claim) based on the FCC's alleged regulatory taking of property in canceling the licenses under the amended regulations, for which Alpine was seeking just compensation.[2]

The government moved to dismiss the case for lack of jurisdiction: it argued that the claims, filed in 2016, were untimely under the six-year statute of limitations, 28 U.S.C. § 2501, which is a jurisdictional provision, *see John R. Sand & Gravel Co. v. United States*, 552 U.S. 130 (2008). The court dismissed for lack of jurisdiction. *Alpine PCS, Inc. v. United States*, 128 Fed. Cl. 303 (2016). The court dismissed the contract claims on the ground that Tucker Act coverage of those claims was displaced ("preempted") by the Communications Act, which directs an aggrieved "holder of any . . . station license which has been modified or revoked by the Commission" to the D.C. Circuit for judicial relief. *Id.* at 308 (quoting 47 U.S.C. § 402(b)(5)). The court determined that the takings claim was untimely, holding that claim to have accrued no later than 2008, when the licenses were re-auctioned, more than six years before 2016. *Id.* at 309.

This appeal followed. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(3).

---

[2] Alpine's complaint also alleged fraud in the inducement, which the Court of Federal Claims dismissed as a claim sounding in tort and outside its jurisdiction. Alpine does not challenge that ruling on appeal.

II

A

We review de novo the court's dismissal of claims for lack of subject-matter jurisdiction under the Tucker Act. *Folden v. United States*, 379 F.3d 1344, 1354 (Fed. Cir. 2004).

As relevant here, the Tucker Act waives sovereign immunity for, and provides for Court of Federal Claims jurisdiction over, monetary claims against the United States "founded [] upon . . . the Constitution . . . or upon any express or implied contract with the United States." 28 U.S.C. § 1491(a)(1). On its face, therefore, the Tucker Act encompasses Alpine's contract claims and its takings claim.

The Supreme Court, however, has described the Tucker Act as serving a "gap-filling role" by allowing "for an action against the United States for the breach of monetary obligations not otherwise judicially enforceable." *United States v. Bormes*, 568 U.S. 6, 12–13 (2012) (footnote omitted). In accordance with that characterization, the Court has held that the Tucker Act does not apply in various circumstances in which Congress has provided "a precisely drawn, detailed statute" that "contains its own judicial remedies." *Id.* at 12 (internal quotation marks omitted). Where it has found those circumstances, the Court has held that the "specific remedial scheme establishes the exclusive framework for the liability Congress created under the statute" and "displace[s]" the Tucker Act. *Id.*

The Court has found such circumstances in a number of cases. *See, e.g., Horne v. Dep't of Agriculture*, 569 U.S. 513, 526–28 (2013) (holding that Agricultural Marketing Agreement Act of 1937 displaces Tucker Act); *United States v. Fausto*, 484 U.S. 439, 454–55 (1988) (holding that the Civil Service Reform Act, which "established a

comprehensive system for reviewing personnel action taken against federal employees" and which "deliberate[ly] exclu[ded] employees in respondent's service category from the provisions establishing administrative and judicial review for personnel action of the sort at issue here," displaces Tucker Act jurisdiction over claims based on such personnel actions under the Back Pay Act); *United States v. Erika, Inc.*, 456 U.S. 201, 208 (1982) (holding that Tucker Act jurisdiction over certain claims involving Medicare Part B payment decisions was displaced by "precisely drawn provisions" of the Medicare statute); *Brown v. Gen. Servs. Admin.*, 425 U.S. 820, 834–35 & n.10 (1976) ("precisely drawn, detailed statute" of Section 717 of the Civil Rights Act of 1964 provides the exclusive judicial remedy for claims of racial discrimination against the government, withdrawing jurisdiction under Tucker Act).

This court has drawn the same conclusion in several cases, recognizing that "[w]hen such a 'specific and comprehensive scheme for administrative and judicial review' is provided by Congress, the Court of Federal Claims' Tucker Act jurisdiction over the subject matter covered by the scheme is preempted." *Vereda, Ltda. v. United States*, 271 F.3d 1367, 1375 (Fed. Cir. 2001) (quoting *St. Vincent's Med. Ctr. v. United States*, 32 F.3d 548, 549–50 (Fed. Cir. 1994)); *see, e.g.*, *Tex. Peanut Farmers v. United States*, 409 F.3d 1370, 1373–74 (Fed. Cir. 2005) (district courts' exclusive jurisdiction over claims against Federal Crop Insurance Corp. in 7 U.S.C. §§ 1506(d), 1508(j), withdrew Tucker Act jurisdiction over claims for breach of crop insurance contract); *Telecare Corp. v. Leavitt*, 409 F.3d 1345, 1349 (Fed. Cir. 2005) (noting precedent that, as to certain claims arising under the Medicare Act, Tucker Act jurisdiction is displaced by the comprehensive "specialized administrative and judicial review process" for those claims, but holding that the particular claims at issue, for

which that process was unavailable, did not arise under the Medicare Act and hence remained within Tucker Act).

## B

The Court of Federal Claims concluded that Tucker Act jurisdiction over Alpine's contract claims is displaced by the comprehensive scheme for review provided in the Communications Act of 1934. We agree.

"To determine whether a statutory scheme displaces Tucker Act jurisdiction, a court must 'examin[e] the purpose of the [statute], the entirety of its text, and the structure of review that it establishes.'" *Horne*, 569 U.S. at 527 (quoting *Fausto*, 484 U.S. at 444). In *Horne*, the Court determined that the Agricultural Marketing Agreement Act of 1937 provided mechanisms by which handlers could file a petition directly "challeng[ing] the content, applicability, and enforcement of marketing orders . . . , including constitutional challenges, in administrative proceedings." *Id.* (citing 7 U.S.C. § 608c(15)(A)–(B)). After receiving an administrative ruling by the Secretary of Agriculture, the handler aggrieved by the order could request review by a district court, sitting in equity. *Id.* (citing 7 U.S.C. § 608c(15)(B)). The Supreme Court concluded that those statutory provisions, 7 U.S.C. § 608c(15)(A)–(B), "afford handlers a ready avenue to bring takings claim[s] against the [United States Department of Agriculture]" and displace Tucker Act jurisdiction. *Id.* at 527–28.

In *Folden*, we examined in detail the Communication Act's "comprehensive statutory and regulatory regime governing orders of the [FCC]," including the remedial scheme of administrative review under 47 U.S.C. § 155 and judicial enforcement and review under §§ 401–02. 379 F.3d at 1355–58. We held that the comprehensive scheme displaces Tucker Act jurisdiction for, *inter alia*,

FCC decisions and orders falling within 47 U.S.C. § 402(b). *Id.* at 1358.

Here, the key question is whether Alpine's contract claims fall within § 402(b). That subsection provides for appeals to the D.C. Circuit of FCC "decisions and orders" "[b]y the holder of any . . . station license which has been . . . revoked by the [FCC]." § 402(b)(5). Alpine's contract claims, which challenge the validity of the FCC's cancellation and revocation of its station licenses, fall squarely within that provision.

The D.C. Circuit came to the same conclusion in 2014. That court affirmed a district court order dismissing for lack of jurisdiction the same contract claims we now have before us. The D.C. Circuit explained: "Although camouflaged as a contractual dispute, Alpine's suit really challenges the FCC's decision to 'revoke' the licenses for non-payment and thus falls squarely within subsection 402(b)'s bull's-eye." *Alpine*, 563 F. App'x at 789.

Alpine contends that it is not challenging the revocation of its licenses, but rather "the breach of a contract that *resulted* in forfeiture of [the] licenses." Alpine Reply Br. 9. That distinction is an empty one. Subsection 402(b)(5) is not limited to review of the act of revocation but rather allows for judicial review of the FCC's underlying revocation decision. In particular, § 402(b)(5) provided Alpine the opportunity to argue that the FCC's decision was contrary to the terms of the contract. *See Biltmore Forest Broad. FM, Inc. v. United States*, 555 F.3d 1375, 1382 (Fed. Cir. 2009) (affirming dismissal of a contract claim brought in the Court of Federal Claims because "the District of Columbia Circuit not only has exclusive jurisdiction to review the grant or denial of FCC licenses [under § 402(b)], but also has exclusive jurisdiction to adjudicate the underlying issue of FCC rules compliance necessary to the licensing decision"—the "exact issue [decided] in *Folden*").

Alpine also argues that its contract claims are not within the scope of § 402(b) because the D.C. Circuit is an appellate forum "ill-equipped" to handle matters that require "discovery, trial, and other relevant procedures." Alpine Br. 19–20. That contention is unpersuasive. In addition to its powers to order supplemental briefing on any relevant issue, that court has the authority to remand the case to the FCC for any additional record development that is necessary. *See F.C.C. v. ITT World Commc'ns, Inc.*, 466 U.S. 463, 469 (1984) (appellate court may "fairly [] evaluate" even a claim of ultra vires agency action on direct review under the Administrative Procedure Act because, if the court "finds that the administrative record is inadequate, it may remand to the agency" for further proceedings); *Harrison v. PPG Indus., Inc.*, 446 U.S. 578, 593–94 (1980) (direct review of agency action by court of appeals under Administrative Procedure Act, even for agency action without formal adjudication, is not irrational because "an appellate court may always remand a case to the agency for further consideration").

Alpine itself, between 2002 and 2010, took advantage of the Communications Act's administrative and judicial remedies and raised its contract claims before the FCC and the D.C. Circuit. When the applicable regulations threatened cancellation of the licenses in the summer of 2002, Alpine filed administrative requests for waiver of those regulations and restructuring of the payment plan. After the Wireless Communications Bureau denied those requests, Alpine filed a petition for reconsideration by the FCC, arguing, among other things, that the FCC "breached fiduciary duties owed to Alpine," including "a duty of candor and good faith." *In re Alpine*, 25 FCC Rcd. at 506–07. The FCC denied the petition, and Alpine proceeded to the next step in the remedial scheme— review by the D.C. Circuit. There, Alpine argued that the FCC breached its contractual obligations under the notes

and that "the FCC violated the implied covenant of good faith [and fair dealing]." Final Br. of Appellant Alpine PCS, Inc., *Alpine PCS, Inc. v. FCC*, No. 10-1020, 2010 WL 3253656, at *32, *35 (D.C. Cir. June 3, 2010). Alpine asserted that the D.C. Circuit had "jurisdiction to hear Alpine's appeal pursuant to 28 U.S.C. § 2342(1), and[] 47 U.S.C. §§ 402(a) and 402(b)(5)." *Id.* at *1. The D.C. Circuit summarily affirmed the FCC's decision. *Alpine*, 404 F. App'x 508.

We hold that Alpine's contract claims fall within the exclusive jurisdiction of the D.C. Circuit under 47 U.S.C. § 402(b)(5) and therefore fall outside the Tucker Act jurisdiction of the Court of Federal Claims.

## C

We also hold that the same conclusion applies to Alpine's takings claim: Tucker Act jurisdiction over the claim is displaced by the Communications Act. The Court of Federal Claims did not dismiss the takings claim on this basis, and the government does not argue for lack of jurisdiction on this particular ground. But we are independently obliged to consider defects in the trial court's jurisdiction, even when not raised by the parties. *See, e.g., Gonzalez v. Thaler*, 565 U.S. 134, 141 (2012) ("When a requirement goes to subject-matter jurisdiction, courts are obligated to consider *sua sponte* issues that the parties have disclaimed or have not presented."); *United States v. Cotton*, 535 U.S. 625, 630 (2002); *Mitchell v. Maurer*, 293 U.S. 237, 244 (1934). And the Supreme Court has confirmed that federal courts have discretion to choose which among several possible jurisdictional (or even certain non-jurisdictional threshold) issues to decide. *See Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 584–85 (1999); *see also, e.g., Law Offices of David Efron v. Matthews & Fullmer Law Firm*, 782 F.3d 46, 51 (1st Cir. 2015). In this case, reaching the displacement issue is particularly justified for at least two reasons taken to-

gether: first, the displacement issue is more straightforward than the timeliness issue, especially given that we have already analyzed the issue for the contract claims; second, the government's brief argument in support of the timeliness ground relies centrally on a decision, *Soriano v. United States*, 352 U.S. 270 (1957), that itself leads to the inquiry into whether another statutory regime displaces the Tucker Act. *Id.* at 274–75 (holding that accrual of takings claim was not postponed by the availability of an Army Claims Service remedy where Congress "ha[d] not so restricted the jurisdiction of the Court of Claims").

Alpine's takings theory is that the licenses are property for purposes of the Takings Clause and that the FCC's cancellation of the licenses resulted, at some point, in a taking for which Alpine was due just compensation. In this court, the judgment on appeal is a dismissal for lack of jurisdiction, not on the merits. And the government, in its brief as appellee, has not contested Alpine's premise, which the Court of Federal Claims endorsed, that the licenses are property protected by the Takings Clause. *Alpine PCS*, 128 Fed. Cl. at 308–09. We take the premise as a given (without deciding whether it is correct) for purposes of assessing the jurisdictional issue.

What the parties have contested in their briefs is when any taking at issue occurred and gave rise to a claim for just compensation under the Tucker Act. The government contends that the claim accrued before January 4, 2010—making the complaint in this case, filed on January 4, 2016, out-of-time under the six-year statute of limitations. In particular, the government contends that the alleged taking occurred at one or more of the following times: when the FCC canceled the licenses in 2002; when the FCC informed Alpine that Alpine was in default and that no action would be taken on the restructuring request in 2004; when the FCC Wireless Telecommunications Bureau denied Alpine's waiver and restructuring

requests in 2007; or when the FCC re-auctioned the licenses in 2008. The Court of Federal Claims agreed that the taking, if there was one, occurred no later than 2008. *Alpine PCS*, 128 Fed. Cl. at 309.

Alpine, on the other hand, contends that the alleged taking did not occur, and the claim did not accrue, until January 5, 2010, when the FCC reached a final decision not to waive the automatic cancellation provision of the amended regulations. Alpine relies on Supreme Court decisions that have articulated two "ripeness" requirements applicable to certain regulatory takings claims (against state or local government entities): a sufficiently definitive decision about the injury to the complainant's property from the government entity alleged to have committed the taking; and a sufficiently definitive denial of just compensation for such a taking. *See, e.g.*, *Palazzolo v. Rhode Island*, 533 U.S. 606, 618–26 (2001); *Suitum v. Tahoe Reg'l Planning Agency*, 520 U.S. 725, 733–34 (1997); *Williamson Cty. Reg'l Planning Comm'n v. Hamilton Bank of Johnson City*, 473 U.S. 172, 186, 194 (1985). The Court has also discussed the *Williamson County*-based ripeness requirements in *Horne*, 569 U.S. at 525–26, a case involving the federal government. The parties here dispute the scope of those decisions and whether and how they apply in this case to identifying the accrual date of a claim for Tucker Act compensation, notwithstanding the availability of relief from the FCC and the FCC's final denial of such relief on January 5, 2010.

The government relies for its pre-2010-accrual argument on the Supreme Court's decision in *Soriano*—which the cited *Williamson County* line of cases does not discuss. The Court in *Soriano* held that a Tucker Act claim for just compensation accrued at the time of a war-time requisition of material from the plaintiff (by Philippine Army units assertedly acting under the authority of the U.S. Army), whether or not the plaintiff had yet sought com-

pensation from another government entity, the Army Claims Service. 352 U.S. at 274–75. The Court stated as its ultimately decisive rationale that Congress "has not so restricted the jurisdiction of the Court of Claims" to hear a just-compensation claim for a completed taking based on the availability of a potential other avenue of relief. *Id.*

*Soriano* thus suggests that, even to decide the timeliness issue in the way the government has argued it, we would have to examine whether the Communications Act remedy displaces Tucker Act jurisdiction for the governmental action challenged as a taking here. In any event, an examination of that question leads to a conclusion of no jurisdiction in this case without routing that conclusion through a determination regarding timeliness. Just as we concluded that the Communications Act displaces Tucker Act jurisdiction over Alpine's contract claims, we conclude that, as relevant to Alpine's quest for relief under the Takings Clause, the Communications Act provides "a ready avenue to bring [a] takings claim" and "withdraws Tucker Act jurisdiction." *Horne*, 569 U.S. at 527–28. Finding such displacement of Tucker Act jurisdiction, we need not further explore the timeliness issue.

There is no disagreement between the parties about the proposition that the FCC had the power to grant Alpine adequate relief, by eliminating the taking, providing compensation, or some combination. Thus, Alpine insists that the FCC could have done the following:

> forgiven any amounts still owing on the licenses, concluded that Alpine was entitled to a refund of some or all the amounts it had already paid, provided equivalent spectrum or other compensation to the holder of the spectrum [after re-auction] and awarded the [original] spectrum to Alpine, awarded Alpine licenses of equivalent value, provided Alpine with a voucher representing the

amount to which Alpine was entitled and permitting the value of the voucher to be used or assigned to third parties in future spectrum auctions to acquire alternative spectrum, or taken any number of other remedial steps had it concluded that the [Wireless Telecommunications] Bureau decision was erroneous.

Alpine Br. 24. The government, for its part, has not denied that the FCC could have provided Alpine adequate relief.[3] Significantly, compensation in a form other than monetary damages can be constitutionally adequate. *See Reg'l Rail Reorg. Act Cases*, 419 U.S. 102, 150–51 (1984) ("No decision of this Court holds that compensation other than money is an inadequate form of compensation under eminent domain statutes."). The displacement question before us therefore is limited to a situation in which the parties do not dispute the adequacy of the non-Tucker Act remedial regime both to adjudicate the takings claim and, if a taking is found, to provide the constitutionally required relief (by curing the taking, providing just compensation, or some combination).

The Communications Act, including 47 U.S.C. § 402(b), readily supports the conclusion that, as relevant to Alpine's grievance, there is a comprehensive statutory scheme through which Alpine could present, and is directed to present, its takings claim, to the exclusion of the Tucker Act under the *Horne* analysis. As for relief at the

---

[3] *See also* Oral Argument at 28:40–29:00, http://oralarguments.cafc.uscourts.gov/default.aspx?fl=20 17-1029.mp3 (during oral argument government counsel stated, regarding Alpine's list of compensation options, that, "Yes, then that would be the case. . . . I cannot say that there's nothing that the FCC could have done to provide them any sort of remedy.").

agency level, there was no procedural impediment to Alpine's presenting a takings claim to the FCC. The FCC did not suggest that it lacked the authority to review the license cancellation and take steps to provide compensation. *See generally In re Alpine*, 25 FCC Rcd. 469 (FCC review of Alpine's requests to waive the automatic cancellation rule and to restructure the payment plan); *see also In re Alpine*, 22 FCC Rcd. 1492 (Wireless Telecommunications Bureau review of Alpine's requests). Nor would Alpine's takings claim have been futile in agency proceedings; for example, Alpine's claim would not have required the FCC to question the constitutionality of a statute. *See Weinberger v. Salfi*, 422 U.S. 749, 765 (1975) (noting general rule against agency authority to deem statutes unconstitutional). And the FCC is generally under an obligation not to take action contrary to the Constitution and to hear properly presented constitutional claims. *See* 5 U.S.C. § 706(2)(A), (B) (providing for reviewing court to set aside agency action that is contrary to law, including Constitution); *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 516 (2009); *Graceba Total Commc'ns, Inc. v. FCC*, 115 F.3d 1038, 1041–42 (D.C. Cir. 1997) ("The Commission has an obligation to address properly presented constitutional claims which, like this one, do not challenge agency actions mandated by Congress.").

In any event, the judicial review scheme under the Communications Act squarely covers Alpine's grievance. Alpine's takings claim (like its contract claims) is based on the FCC's cancellation of the station licenses, a decision that falls squarely within the judicial-review provision, 47 U.S.C. § 402(b)(5). The very purpose of the provision is to provide a remedy for licensees, like Alpine, that have suffered an injury from an FCC licensing decision. Such parties are the "one[s] likely to be financially injured by the issue [or revocation] of a license" and "the only [ones] having a sufficient interest to bring to the

attention of the appellate court errors of law in the action of the [FCC] in granting [or revoking] the license." *F.C.C. v. Sanders Bros. Radio Station*, 309 U.S. 470, 477 (1940); *see also Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 394 n.8 (1987) (noting that § 402(b) "grant[s] an explicit right of review to all persons adversely affected or aggrieved by particular . . . licensing actions by the [FCC]"). That remedial scheme provides for judicial review of constitutional challenges to the license cancellation. *See Alvin Lou Media, Inc. v. F.C.C.*, 571 F.3d 1, 8 (D.C. Cir. 2009) ("This court 'permit[s] both constitutional and statutory challenges to an agency's application . . . of a previously promulgated rule, even if the period for review of the initial rule has expired.'") (quoting *Graceba*, 115 F.3d at 1040)). And upon review of Alpine's takings claim, the D.C. Circuit was capable of ordering any appropriate relief, whether on appeal or on remand to the agency. *See, e.g.*, *QUALCOMM Inc. v. F.C.C.*, 181 F.3d 1370, 1381 (D.C. Cir. 1999) (ordering FCC "to take prompt action to identify a suitable spectrum and award QUALCOMM the license for it").

Under the comprehensive statutory scheme, then, Alpine could have raised a constitutional takings claim; the FCC had the authority to grant relief; and the D.C. Circuit had jurisdiction to review whether a taking occurred and, if so, whether the FCC decision "yield[ed] just compensation." *Williamson Cty.*, 473 U.S. at 194. The statutory scheme thus affords Alpine "a ready avenue" to bring its takings claim and displaces Tucker Act jurisdiction over that claim. *Horne*, 569 U.S. at 527–28. This conclusion, though statute-specific, accords with similar conclusions we have reached under other statutes. *E.g.*, *Innovair Aviation Ltd. v. United States*, 632 F.3d 1336, 1342–43 (Fed. Cir. 2011) (holding that Tucker Act jurisdiction over takings claim based on forfeiture of property seized pursuant to 21 U.S.C. § 881 was displaced by the

Controlled Substances Act's scheme for administrative and judicial review) (citing *Vereda*, 271 F.3d at 1375 (same)); *Lion Raisins, Inc. v. United States*, 416 F.3d 1356, 1370, 1372–73 (Fed. Cir. 2005) (affirming dismissal of takings claim for lack of jurisdiction under the Tucker Act because the "administrative and judicial review procedures available under 7 U.S.C. § 608c(15)(A) provide a remedy to recover the value of the rights alleged to be taken").

## III

For the foregoing reasons, we affirm the judgment of the Court of Federal Claims.

**AFFIRMED**